Let me call the case. The next case today is Securities & Exchange Comm'n v. David Johnston, Appeal No. 192264. And you have reserved two minutes for rebuttal. Thank you. You may proceed. Thank you. The verdict below should be reversed for two independent reasons. First, Mr. Johnston was under no legal duty to disclose the FDA recommendation of a second trial. When, one, the recommendation was not a requirement for approval of TiVo. Two, the FDA itself never concluded a second trial was necessary for approval during the relevant period. Three, Aveo expressly disclosed the FDA's concerns with the results of TiVo 1 trial. Four, Aveo expressly warned of the risk that the FDA could require a second trial. And finally, two national law firms independently reached a conclusion that no disclosure of the recommendation was required. Second, there was no evidence of scienter presented at the trial. There was no witness who testified that Mr. Johnston intended to violate the securities laws. There was no exhibit introduced evidencing that Mr. Johnston intended to violate the securities laws. No Mr. Johnston's recommendation to management that Aveo disclose the FDA's concerns knowing that it would and in fact did cause a significant stock price decline is inconsistent with a finding of scienter. And finally, the law firm negative assurance letters that I mentioned further undercut scienter. The conclusions of those law firms obviate a finding that Mr. Johnston's either reckless or even negligent. Now go ahead. Are you finished with your initial statement? I am your honor. There's no question that is there because you can see in your reply brief that the recommendation of the FDA was material. Your honor, we don't we don't contest materiality. I think one could make an argument that pending upon what that recommendation morphed into it could turn out not to be material. For example, and this is part of the the uncertainty with the could argue that's not material. But but the argument here is not to materiality. One can assume materiality for this argument. And it really is a duty to disclose and particularly this being an omissions case. That's my question is whether you conceded or not in your reply brief that that it was material for purposes of this. Yes, we would concede that your honor. Okay. And the second thing is Scienter. You say it with a false statement indicates I enter. If you have an untrue statement of a material fact, that would be that would be something that would fall into the grounds of Scienter acting with intent to violate the securities laws. Well, your client made a direct statement in response that he did not have any, quote, formal discussions. When asked what whether he had discussed any further trials in the kidney cancer with the FDA. Is that a false statement? Your honor, I would disagree that that's a false statement at the time that that conference, the only dialogue that the company had had with FDA was the pre NDA meeting in May, and they disclosed the FDA is concerned. In the interim, the only thing that happened is the company made a submission and to schedule a meeting with the FDA, what's known as a type A meeting, that meeting did not happen. So in the context of what Mr. Johnson was speaking about, they had had no formal discussions. That's what he wasn't asked about a formal discussion. He was asked whether there had been any discussions at all. And there had been. Well, your honor, the only discussions that had taken place between the FDA and avail with the discussions at the meeting of the May pre NDA meeting on May 11. Was there a discussion, a recommendation, in fact, that that you have further trials? Yes, your honor. My point was that the discussions with the FDA was disclosed. That was that was the point of the disclosure the company made. We've spoken to FDA after we've completed our phase three trial to talk about our new drug application. In those discussions, the company expressly disclosed that the FDA had raised concerns about the overall survival data in the secondary endpoint of the trial. And the FDA further said that those concerns were significant enough they potentially could be an issue that would prevent filing of the new drug application. And if the FDA elected to file the new drug application, those concerns would be a review issue. So I think in the context to suggest that that discussion happened, that was a discussion that was fully disclosed. The point from the question at the time at the RBC conference is, have you had these discussions? And he said, we haven't had formal discussions. And that was a true statement. The company was attempting to do so. They submitted a proposal for another trial. They were scheduled to have a meeting. That meeting was canceled. And they Mr. Johnson made the presentation at RBC. And the only other thing I would note about that... Before you go any further, did the FDA at any point recommend that further trials take place? The FDA recommended a further trial at the November 11th pre-NDA meeting. It was unclear to the company... Was that recommendation ever disclosed? The recommendation was not disclosed by the company. Why? So because the company did not know what the contours of the recommendation was. It was not a requirement. And it made a big difference from the company if the recommended trial was going to be a pre- or a post-approval trial. And at the time the company made the statement in August, they had actually asked FDA for clarification on that and had not received a response from the FDA. So in the context of what the company did disclose, they disclosed first in their risk factors that the FDA ordinarily requires two phase three trials. The company has only done one phase three trial. And the company expressly said, we do not know whether the FDA would require us to do a second trial. If the FDA required us to do a second trial, that would obviously set back the timeline of our NDA. If you had disclosed to the public that the FDA had recommended that you have further trials, would that have affected the stock market, the price of your... Well, we don't know that, your honor. The disclosure that the company elected to make, knowing that it would negatively affect the stock price, was that the FDA has expressed concerns about the data in the trial and that those concerns could lead to the FDA not even accepting an NDA or to be... There's five minutes remaining. And that dropped the company's stock price 27%. So the company's position is it was not hiding the FDA's concerns. It actually made an affirmative effort at the recommendation of my disclosure. The company did not have to say anything about their discussions with the FDA. They went out and they said what they knew for certainty and they were waiting for clarification. And they knew, if you look in the company's... The exhibits that were there, they had a matrix that they had put together that was designed to say, do we have a disclosable event? And the company had concluded that if the FDA said you are required to have another trial prior to approval, that would be a disclosable event. Did AVO make the law firms aware of this recommendation? Yes, the law firms... Well, one law firm was the company counsel. The other law firm, Robson Ray, was counsel to the underwriters. And in connection with an underwritten offering, the underwriters require what are known as these negative assurance letters. And the law firms say, based upon what we know, that we're not aware of any facts that needed to be disclosed to make what was disclosed not materially misleading. Both of those law firms had the FDA minutes, were aware of the recommendation, and that was the conclusion that they reached. Now, the SEC, in its brief, suggests that they were only relying on what Mr. Johnson said. And that was not the testimony at trial. The testimony at trial was that they spoke with Mr. Johnson, they spoke with other members of management, and they had the FDA minutes that disclosed the recommendation. So, if you have two law firms that reach the same conclusion that it isn't that the information is material, it isn't that it might be important to investors, does it make what the company said materially misleading? Mr. Sylvia, could you help me with the chronology here? Because I'm a little confused by your answer to Judge Torawaya. As I understand it, there was a meeting, the pre-NDA meeting, and at that meeting, as reflected in the minutes, the FDA recommended that the sponsor conduct a second adequately powered trial. That's correct, Your Honor. And that sounds to me like the FDA discussed a further trial at that meeting. Am I correct? They made the recommendation at that meeting, Your Honor. You are correct. Well, how do you make a recommendation without discussing it? No, I agree with you, Your Honor. It was discussed at that meeting. So, the FDA did discuss making a further trial. After that, and after Ropes and Gray and Wilmer Hale had issued its letters, an analyst on a call then asked Johnson, has the FDA discussed any further trials? So, it seems to me at that point, if he's going to question, the only truthful answer is yes. And instead, or he could have said, I'm not willing to discuss that. But instead, he said, we've not had any formal discussions, no. And as I understand it, neither of the law firms opined that it was proper to answer that question in that way. They had simply opined prior to then, that based what existed prior to then, and prior to that question being asked, there wasn't an affirmative obligation to volunteer the information. Yes, Your Honor. And looking at some of this, it has to be in context, temporally. And temporally, we're talking about February 27, 2013 at the RBC Conference, which is months after the company has disclosed the concerns, the months after the company has disclosed the FDA's guidance that it would be both a filing and a review issue. And in between that period of time, what the company had tried to do was to have a formal discussion. They'd made a recommendation. The formal discussion was... But that's saying they tried to have another discussion. But I'm just seeing, I don't see how he could not have answered that question, yes, if he was trying to be truthful. Well, he goes on, I think in the same, to put it in context to the same thing. He says, he goes through the scenarios. He goes through, and this is on page 2495. There's a whole range of possibilities that might come out of this. The most positive is that ODAC and the FDA says, yes, we understand. We believe that the company's explanation for the overall survival, and I'm paraphrasing data, that explanation makes sense. And on the other hand, they could say, this sounds plausible. We would like to see a confirmatory trial before you start marketing this. That's what we call the bad news scenario. But in between, there's a whole series of things. And it's fairly conceivable that they might want a confirmatory trial post-marketing. That's exactly what the company was in the process of trying to get guidance from FDA. So the context that this statement was made is in the context that the company has made a proposal for the timing and the format of another trial. And they had not had a discussion with FDA about that trial. They didn't know what trial the FDA was going to require, if any. And in fact, just a month later, when the company did finally have that type A meeting with FDA, FDA sent some conflicting signals. And the response from Dr. Slickenmire was, are you telling us that you're now requiring a second trial? And the FDA said, no, your application is still under review. So it was not even decided whether the FDA would require another trial. And that was the whole point of the company not disclosing the recommendation. It's because there was uncertainty around that. And as the court has observed in Biogen IDEC, for example, sometimes disclosing things when you don't have enough information actually can do a disservice. I guess what I'm having trouble directing your attention to is it seems to me, we're not even talking about a duty to disclose here. We're talking about giving a false answer to a question on a very material fact. Well, I guess the way that, again, putting it, the FDA pre-NDA meeting was a meeting where the company walked out and said, what is it that the FDA wants, if anything, and do we need to do another trial? And I think in the context of this, where you have to look, where Mr. Johnson and the company are now seven or eight months later than that, they are still trying to get information from FDA. What is this trial going to look like? Are you going to require one? And for example, for the company, if it was a post marketing commitment, that was no big deal because the company was going to be doing that anyway. So it was very important for the company to know what it was that the FDA wanted and not to give an impression that the FDA either was too negative on the drug or too positive on the drug. And that's why the company made the decision to disclose the FDA's concerns. Is this time up? That is over time, Judge, yes. Ah, okay. You'll have to rest though. Thank you, Your Honor. Thank you, Attorney Sylvia. Please remain on the telephone and you can mute your video. So leave your telephone on, but mute your video. Thank you. And Attorney Alvarez, you may proceed. Good afternoon. Good morning, Your Honor. Yes, just good morning. Yes, good morning, Your Honors. And may it please the court, my name is Paul Alvarez. I represent the Securities and Exchange Commission. As your questions have gotten right to the heart of this, this is a very simple case, Your Honors. Under the anti-fraud provisions of the federal securities laws, while you may not have an obligation to speak affirmatively about something, once you choose to speak about it, you have to tell the truth. You cannot make misstatements of material fact that mislead investors. And that's exactly what David Johnston did here. As Mr. Johnston was the CFO and the head of corporate communications for Aveo, he misled investors about the fact that the FDA had recommended a formal, formally recommended a second phase three clinical trial for Aveo's flagship drug, TiVo, in response, direct response to questions about whether the FDA had made such a recommendation. He caused Aveo representatives to state that they wouldn't want to speculate as to whether or not the FDA had made such a recommendation and that they had not engaged in any formal discussions about conducting such a recommendation, even though he knew that in May of 2012, the FDA had made such a formal recommendation. And even though he knew that in response to that, Aveo had planned an $83 million phase three clinical trial, a second trial, and had formally proposed that in a formal type A meeting request and that the FDA had responded in writing to that formal type A meeting request. Aveo seems to be making a big deal out of this formal versus informal notion. Does the FDA consider the pre-meeting informal? I don't know whether the FDA considers it formal or informal. I don't think that distinction matters at all. I think if you look at what the questions are, and I think as you assess whether a statement is materially misleading, and that really is the crux of the issue here for the jury, whether these statements were misleading, as you look at that, you have to look in light of the circumstances under which the statements were made. And the questions, as Judge Kayada pointed out, the questions were not, did you have formal discussions? The questions were, did the FDA, did you have discussions? And then when, and in August of 2012, I'd like to point the court to the questions asked there. Analysts asked, did the FDA kind of push you in a different direction of maybe doing some additional new analysis or additional studies? Or did they discuss other possibilities as a way to fix the survivability issue? To respond to that, the only truthful answer, as Judge Kayada pointed out, is yes, they did. This is not a matter of formal versus informal. This is a matter of answering the questions that were asked. And to Judge Kayada's point, certainly Mr. Johnston and Aveo could have said, we're not going to comment on that. This isn't a question about whether they had a duty to disclose, but whether what they disclosed was materially misleading. And in light of the record evidence here, a rational jury viewing that evidence in the light most favorable to the commission very easily could have concluded that Mr. Johnston's statements were materially misleading. And thus, the verdict should be affirmed. If the court has any questions, I'm happy to answer them. Anybody have questions? I don't. Thank you. Thank you very much, Your Honors. Attorney Sylvia, I believe you have some rebuttal time. Yes. Thank you. I wanted to just address the issue of actually what brought this case, which was the nondisclosure of the recommendation in the context of disclosing the FDA's concerns. And at that time, it is clear that no one knew whether a second trial was going to be required, not even the FDA. And this notion of a formal recommendation versus a recommendation, neither is a requirement. The FDA, the SEC has argued that the FDA cannot, a trial that cannot require an applicant to do anything. And in one sense, that's true, that the applicant doesn't have to do something the FDA requires, but they're not going to get their drug approved. So effectively, they can require something. And in fact, we know that because FDA, that was the question that they posed to the ODAC, is a second trial required? And that was the first time that FDA required a second trial. And in fact, when the FDA requested, it was basically not that what the company had said was untrue about the FDA's concerns, but that that somehow changed the risk profile by not disclosing the recommendation. And I would cite the court to Hill v. Ghazani and saying a duty to disclose only arises where the risk approaches a certainty. In absence of that certainty, a company has no obligation to quantify the precise degree of risk. And that's exactly the case. The company could not quantify the degree of risk because it did not know what type of trial FDA was requiring. And I want to just, in my last time, just make a point about Cienture. One is that it was undisputed at trial that the disclosures were reviewed by the board, by the audit committee, in-house, outside counsel, a disclosure committee. And then we had other two law firms that independently came to the same conclusion that under the facts, that you didn't have an obligation to disclose the recommendation of the trial. And I understand that Judge Cayetta has focused on the analyst presentation. But as I said, I think there is a distinction when you say formal discussions when the mindset is that you're waiting to get a meeting with the FDA to have those discussions. And finally, then I would just comment on the testimony of Dr. Slickenmire. And it was not the testimony. It was actually the presentation at the earnings call at 2780. That's time. I can't speculate on what the agency might want us to do in the future. An important point is that the company had already submitted a proposal trying to find out what type of trial the FDA was thinking about. And more importantly, what the timing of that trial is. And having not had those answers, it would in fact be speculating to say at that time what the FDA might require in the future. Thank you. Thank you. Thank you, counsel. That concludes our argument in this case. Attorney Silvia and Attorney Alvarez, you should disconnect from the hearing. All devices.